## SCANLON v. SCANLON.
### No. 61-4117-E.

Circuit Court, Duval County.

June 25, 1962.

Ray L. Wilson, Jacksonville, for plaintiff.

Albert J. Datz, Jacksonville, for defendant.

FRANK H. ELMORE, Circuit Judge.

This opinion is a predicate to the final decree in this cause.

The plaintiff, Wilson G. Scanlon, a doctor of medicine specializing in psychiatry, filed his complaint on October 10, 1961. In it he charged that his wife, Anita Waller Scanlon, the defendant, was guilty of extreme cruelty towards him and asked for an absolute divorce from her. The allegations of the complaint were enlarged by a more definite statement filed on January 4, 1962 by order of court. On February 6, 1962 the plaintiff filed an amended more definite statement in lieu of the other. The defendant answered the complaint on January 31, 1962 and then by leave of court filed an amended answer and counterclaim on February 28, 1962. By her counterclaim the defendant charged that the plaintiff was guilty of extreme cruelty towards her and wilful, continued and obstinate desertion of her for a period of more than one year. The defendant prayed for the entry of a decree of separate maintenance. The plaintiff answered the counterclaim on March 16, 1962. Trial was had upon the issues framed by those pleadings.

While there are several facets of the evidence which invite discussion and analysis, it is not essential for the purposes of this memorandum to summarize the record of the trial. The pleadings are a fair synopsis of the facts. The evidence is clear if not overwhelming that the marital discord between the parties (both college graduates and persons of refinement and exceptional intellectual stature) resulted from what the defendant regarded as extra-professional association of the plaintiff and some patients, her deep conviction that by precept and example the head of the Silver Hill Foundation exerted an evil influence on him, and her consequent continued efforts by deed and word to achieve the separation of her husband from the medical staff of the Foundation. The defendant's counsel in final argument conceded this and designated it with an asserted avoidance by good intention, as the crux of the defendant's case for denial of an absolute divorce to the plaintiff and the granting of a decree of separate maintenance to her. He contended that her activity which ultimately succeeded in bringing about the plaintiff's separation from his employment on the medical staff of the Silver Hill Foundation was undertaken for his welfare and in the hope of establishing domestic felicity.

Assuming arguendo this to be true, does good motive justify the defendant's conduct? Generally, if an evil or unlawful result be achieved, it matters not how laudable or unselfish was the impulse of the doer of the deed. Men and women and even children were hanged in eighteenth century England for the theft

of a loaf of bread to feed themselves or their starving families. Abortion committed to protect the good name and chaste reputation of a woman is a crime. The killing of an incurable suffering invalid, even at his request, is murder.

But in this case the play and interplay of acts and emotions were so involved and fraught with conflicting overtones of cause and effect that the problem of motivation cannot be solved on the basis of such examples. The plaintiff-husband provoked his wife by social intercourse with some of his patients of both sexes. His involvement with women aroused her jealousy; that with a man the apprehension of homosexuality. She, in turn, by her conduct, evoked many of the acts of which she complains.

Evaluation of the equities requires first some analysis of the marital relationship as it has existed in all times, among all peoples everywhere. With very sparse exceptions marriage has carried with it in varying degrees the concept that the status of a wife is subservient to that of her husband. It is true throughout most of the world today. In certain segments of Western civilization this has been modified. But it has never been abandoned nor rejected. It was not until this century that there was removed from the marriage ceremony of the Anglican Communion the vow of obedience to her husband taken by the wife. The present Queen of England and her sister were both married taking that vow despite its excision. I do not overlook the so-called emancipation of married women by recent repeal or modification of certain statutes but in the present context the use of that development beyond its limited scope can be misleading. For example, in this state when a married woman conveys her separate property her husband is required to join in the execution of the deed even though he has no interest whatsoever in the title. Other laws still discriminate against women, such as that of ineligibility for jury service without special registration.

The law often trails social and economic changes. It is no longer tenable to characterize the female as the weaker sex. Women in this country inherit and own most of the property, they are the beneficiaries of more insurance, they receive better treatment throughout their lives and live several years longer than men on the average. Deaths among women from infectious and parasitic diseases are only two-thirds as frequent as among males, only two-thirds as frequent from diseases of the heart and circulatory system, the respiratory system, and only a little more than one-third from violent and accidental deaths. There are three times as many suicides among males, three times as many homicides, and more than twice the accidental deaths. During the first year of life nearly 40 per cent more male children die. In

numbers, there are more women than men. The evidence is clear that, in a material way at least, women are far more fortunate than men. They are born sounder and stronger, live healthier and longer lives, acquire and possess more of the world's goods and with considerably less effort than men.

Paradoxically, no woman has excelled in any field in which man also participates. Women are not even the finest cooks nor the best tailors. Admitting the biological superiority of the female, her larger share of the wealth and the power that goes with it, and her capacity for emotional sympathy and empathy, it is nevertheless questionable whether her endowments qualify her to substitute her judgment for that of her husband in matters relating to his occupation.

St. Paul, in writing to the Ephesians, said, "Wives, submit yourselves unto your husband, as unto the Lord. For the husband is the head of the wife . . ." In our contemporary culture it would not seriously be contended that a realistic or practical application of the Pauline injunction would command such deference and humility by a wife as that of "Patient Griselda" in Chaucer's *Clerk's Tale* in *The Canterbury Tales*. There the husband took away their two children, told his wife that they were murdered, divorced her and sent her home saying that he was going to marry another. The innocent wife bore with patience and fortitude these and other unbelievable indignities and cruelties. Finally, having proved her merit, she was received again into the graces of her lord.

Today, many married women work and contribute to the family income. In some instances they earn more than their husbands and sometimes they even support their husbands and children by their earnings. One would be blind to the world of things as they are did he not concede that the widespread change (at least in the United States) in the status of the wife from that of being solely occupied with housekeeping and the care of children to that of an active participant in many outside activities has had and is having a profound effect upon the traditional position of wives as enjoined by St. Paul.

But giving full weight to all that and looking the present *mores* of society in this Republic in the eye, is the conduct of a wife who assumes (conceding the highest of motives) that she knows better than her husband what is best for him in the practice of his chosen profession, and who relentlessly pursues her objective to the point of destroying his career, justifiable or excusable? The precedents of two cases aid the answer. Each in its way is parallel to the case at bar.

The first is that of Kaadt v. Kaadt, Supreme Court of Oregon 1924, 223 Pac. 934, from which I quote —

> This is a suit for a divorce. There was a decree for plaintiff as prayed for in the complaint, and from this decree the defendant appeals.

> \* \* \*

> A careful reading and rereading of the testimony satisfies us that, while the defendant is a good woman morally, she possesses such pecularities of temperament that it would be impossible for anybody to live with her in peace, and that her conduct in this respect and general attitude towards her husband have been such as to humiliate him, injure his health and prospects as a physician, and unjustly to degrade him in the community to the extent that it constitutes cruel and inhuman treatment within the meaning of the law.

> The decree of the circuit court is therefore affirmed.

The other case is that of Williams v. Williams, Supreme Court of Minnesota 1907, 112 N.W. 528. Because of the superb discussion I quote at length from the opinion in that case —

> This was an action for an absolute divorce, brought by the husband, plaintiff and respondent, against the wife, the defendant and appellant. The complaint set forth the marriage and the existence of two children — Hazel, aged 24, and Olive, aged 18. The first of the grounds upon which the divorce was sought consisted of cruel and inhuman treatment, detailed in 19 paragraphs, without a charge of actual physical violence. Part of this cruel and inhuman treatment consisted in accusing the plaintiff of infidelity, in spying, and in publishing such accusations. The second ground was desertion. Defendant denied cruel and inhuman treatment, and alleged in justification of her conduct improper conduct of the plaintiff with a young woman who will hereafter be referred to as the plaintiff's bookkeeper. She also filed a cross-complaint asking a separation from bed and board upon the ground of the husband's cruel and inhuman treatment, improper conduct with the said young woman, and desertion. The court finds in detail, and therefrom concluded as a matter of law that neither party had deserted the other; that the wife had been guilty of cruel and inhuman treatment of the husband within the meaning of the divorce law; and that the husband had not been so guilty with reference to the wife. The court, therefore, granted the plaintiff an absolute divorce, but required him to provide for the wife's support for the rest of her life, unless she should remarry, in the sum of $1,000 per annum. From an order denying defendant's motion to grant a new trial, this appeal was taken.

> \* \* \*

> The charges of unchastity made by the wife against the husband continued during a period of more than 18 years. The present inquiry, however, is limited to the last 10 years. The first of two recent aggravated cases concerned a young woman who, the defendant herself testified was "a respectable lady," and against whose character she knew nothing. The defendant, indeed, denied having charged her husband with infidelity with this particular woman. Her testimony in this regard was demonstrated to have been false. The second of such cases concerned another young woman, a bookkeeper in plaintiff's employ. Defendant had a hole

bored in a covered stairway, through which she watched her husband and this bookkeeper work at his place of business in the evenings for three or four weeks. Strong proof of the lack of foundation for her accusations is to be found in her own testimony as to what she thus observed. Many circumstances were referred to as showing some reasonable ground for her suspicion. Careful examination of the record with respect to all of them has satisfied us that the trial court properly regarded them as inadequate, and that her accusations were not justified by probable cause. In quaint, ingenious, and conspicuous ways she spied on her husband and the young woman, and induced and employed many other persons to watch them. The publication of the scandal covered a long period of time, and occurred at divers places to various people. The trial court was justified in finding that the wife caused "many of the [husband's] acquaintances and business associates to suspect the existence of criminal relations between the plaintiff and his women employes, and has subjected him to much discussion, scandal, and ridicule in this regard, and has greatly humiliated him, and has seriously injured his reputation and business standing." The court did not find that "such conduct on her part has to any considerable extent injured his health." It certainly, however, constituted a serious menace, and substantially tended to injure his nervous system, as it has destroyed his peace of mind and domestic happiness.

The court also found, and was justified in finding, that neither party was ever guilty of actual serious physical violence toward the other, nor had any reason to fear such violence. There was testimony that the wife tried to induce one witness to "get a lot of women together and have [the witness'] son to be the head leader of them all, and give them [the husband and the bookkeeper] a coat of tar and feathers." She offered another $150 if he would "shoot the brute" (her husband), and another $5 to hold her husband while she went in his place of business and horsewhipped the girl. This evidence, although corroborated, is justly subject to grave criticism. The wife denied the facts thus testified to; but her own testimony on material points the trial court properly held to have been successfully contradicted. Whatever truth there may have been in these charges, there is, however, no reasonable controversy that her recurrences to the subject of these young women occasioned domestic broils innumerable, distressing, and, on the wife's part, accompanied by paroxysms of rage. The scene of these eruptions of what the trial court calls her "somewhat violent temper and morbidly jealous disposition" was indifferently the home, or where the unhappy pair had gone in search of peace or pleasure, or the husband's place of business, or in public generally. There was proof, for example, of an outbreak of her passion at the table which drove one of the children upstairs. The wife ran around the table and seized a carving knife. The husband and the other daughter, at the end of a couple of hours, "succeeded in quieting her down".

We regard as insignificant here the trial court's finding of fact that the tenderness of her nature, which she did not manifest to her husband, led to the wife's employment to a considerable extent in matters relating to the Society for the Prevention of Cruelty to Animals, against the known wishes of the plaintiff, and that she neglected the management of her household. In that connection, however, a multitude of circumstances appearing in the record — and it is the record only of which we speak — must be considered. Here, however, only their general result may be stated. The husband's success as a large manufacturer made possible his sustained generosity to his family, but brought him nothing

save a house divided against itself. The home was a place of torment. His efforts to attain peace there and elsewhere encountered only reproach and vituperation as fluent as it has been held to have been unjust, and as indelicate as it was irrepressible. The epithets which the wife, according to the record, applied to the women she suspected, are unfit for repetition here. As the trial court remarked: "They were more suitable to a brothel than to polite society." Her abuse of her husband extended to charges of disease et similiter. The years the husband spent in a vain endeavor to mollify the acerbities of this feminine disposition simply extended her opportunities for variation in verbal assault and multiplied the exhibitions of his domestic ignominy. The one certainty in his relations with her was his intolerable and increasing misery.

The plaintiff was not a saint. A man of education, ambitious in business, and commanding general respect, he sometimes resented — to speak euphemistically — her curtain lectures with an emphasis which, in view of the provocation, was not held to have been undue. In its memorandum the trial court remarked with certain justice: "The parties are already divorced, except in name, and it is unthinkable that they should ever live together again as husband and wife, or that the plaintiff should be compelled to continue to call by the name of wife a woman who, on such slight grounds, publicly and persistently asserts her belief in his adulterous relations with other women. While the plaintiff might have shown more consideration than he sometimes did for his wife's feelings, and might have done many things to allay her suspicions, he was certainly under no legal obligations to allow her jealousy to interfere with the management of his business, or to force him to discharge those who were the subjects of her suspicion, so long as he in no manner actually violated his obligations as a husband."

The trial court was justified in its conclusion of law that the defendant had been guilty of "cruel and inhuman treatment," within the meaning of the divorce laws of this state.

There is yet a third case. Cited in the Williams case, it is that of Holyoke v. Holyoke, Supreme Court of Maine, 6 Atl. 827, in which the court said —

Words and deportment may work injury as deplorable as violence to the person. "I will speak daggers to her, but use none," says Shakespeare. Temperament and character so widely differ that conduct cruel to one might scarcely annoy a more callous nature. Having in mind the sacred character of the marital relation, and its influence upon the happiness and purity of society, as well as upon individuals, not overlooking considerations that may not freely be discussed, each particular case must be judged of by its own particular facts and circumstances. Divorce should not be a panacea for the infelicities of married life. If disappointment, suffering, and sorrow, even, be incident to that relation, they must be endured. The marriage yoke, by mutual forebearance, must be worn, even though it ride unevenly, and has become burdensome withal. Public policy requires that it should be so. Remove the allurements of divorce at pleasure, and husbands and wives will the more zealously strive to even the burdens and vexations of life, and soften by mutual accomodation, so as to enjoy their marriage relation. Deplorable as it is, from the infirmities of human nature cases occur where a willful disregard of marital duty by act or word either works or threatens injury so seriously

that a continuance of cohabitation in marriage cannot be permitted with safety to the personal welfare and health of the injured party.

The plaintiff did not desert the defendant. Within two months after their separation he was dismissed from his employment as a direct result of her actions. It was necessary that he seek gainful occupation elsewhere to support himself and his dependents. He did so.

The Japanese have a saying "A woman's tongue is only three inches long but it can kill a man six feet tall." The late East Indian philosopher-poet, Rabindranath Tagore, in one short, pungent verse said more than volumes of learned lore:

*"Why did the lamp go out?*

I shaded it with my cloak to save it from the wind, that is why the lamp went out.

*Why did the flower fade?*

I pressed it to my heart with anxious love, that is why the flower faded.

*Why did the stream dry up?*

I put a dam across it to have it for my use, that is why the stream dried up.

*Why did the harp-string break?*

I tried to force a note that was beyond its power, that is why the harp-string is broken."

The defendant wife has professed remorse. I believe that she truly loves the plaintiff and would forgive him her grievances. I would be happy if their marriage could be preserved, particularly for their children. But I cannot minimize the effect upon him of her studied relentless campaign to remove him from the practice of his profession in an area and in an atmosphere which she deemed inimical to his interest. Her conduct undermined his physical and emotional well-being and caused his dismissal from the medical staff of the Foundation. The years of mistrust, misunderstanding, misconduct and separation destroyed not only his career but also his love. Her assumption of the role of his protector boomeranged. The lamp has gone out. The harp-string is broken.

It is the opinion of the court that the plaintiff, Wilson G. Scanlon, is entitled to an absolute divorce from the defendant, Anita Waller Scanlon. A final decree follows.