154 So.2d 899 (1963)
Anita Waller SCANLON, Appellant,
v.
Wilson G. SCANLON, Appellee.
No. D-451.
District Court of Appeal of Florida. First District.
June 20, 1963.
Rehearing Denied July 23, 1963.
*900 Schevitz & Datz, Jacksonville, for appellant.
Ray L. Wilson, Jacksonville, for appellee.
RAWLS, Judge.
Appellee-plaintiff husband, Wilson G. Scanlon, a medical doctor specializing in psychiatry, instituted this action for divorce. Appellant-defendant wife, Anita Waller Scanlon, by her answer denied the allegations of the complaint and counter-claimed for separate maintenance and custody of the parties' minor children. The chancellor entered a final decree of divorce, granted the wife monthly alimony in the sum of $375.00, custody of the parties' three minor children, and monthly support in the sum of $100.00 for each of them. In addition, the husband was required to pay mortgage and insurance payments on the home owned by the parties in Connecticut, with the wife receiving exclusive possession until she remarries or until all of the children are self supporting.
The wife contends: that the chancellor erred in his rulings permitting an amendment by the husband to his complaint at the time of final hearings, admitting certain evidence, concluding that the husband was entitled to a divorce, and denying separate maintenance; further, that the chancellor erred in not requiring the husband to earn more money than he was making, so that he could pay a larger amount for the support of the wife and children.
The husband is pleased with the decree of divorce but is unhappy with the amount of support money and fees for the wife's attorneys which the chancellor required him to pay.
This was a hotly contested divorce case culminating in a record consisting of six volumes of testimony, depositions and exhibits. The sum and substance of this voluminous record is that the husband had for many years prior to moving to Florida been associated with Dr. William B. Terhune, who operated his own sanitorium, Silver Hill Foundation at New Canaan, Connecticut. The Silver Hill Sanitorium apparently catered primarily to those of substantial means. From 1957 until the final separation of the parties, the wife unilaterally concluded that: her psychiatrist husband was in desperate need of psychiatric treatment at some institution other than Silver Hill; her husband's patients were exerting an unhealthy influence upon him; the founder and director of Silver Hill was not operating the type of institution conducive to the talents of her husband; and that her husband was wasting *901 away his life and professional training. The wife concluded that the only way she could "save" her husband was to employ any means which would result in his being severed from the staff at Silver Hills Foundation, necessitating his moving to another locale. She was successful. In 1960, Dr. Scanlon moved to Florida, "started all over again", and was successful in being admitted to practice in this state.
We dispose of all the wife's points on appeal, save the one pertaining to alimony and support money, by liberally quoting from the learned chancellor's memorandum opinion:
"The evidence is clear if not overwhelming that the marital discord between the parties (both college graduates and persons of refinement and exceptional intellectual stature) resulted from what the defendant regarded as extra-professional association of the plaintiff and some patients, her deep conviction that by precept and example the head of the Silver Hill Foundation exerted an evil influence on him, and her consequent continued efforts by deed and word to achieve the separation of her husband from the medical staff of the Foundation. The defendant's counsel in final argument conceded this and designated it with an asserted avoidance by good intention, as the crux of the defendant's case for denial of an absolute divorce to the plaintiff and the granting of a decree of separate maintenance to her. He contended that her activity which ultimately succeeded in bringing about the plaintiff's separation from his employment on the medical staff of the Silver Hill Foundation was undertaken for his welfare and in the hope of establishing domestic felicity.
* * * * * *
"Evaluation of the equities requires first some analysis of the marital relationship as it has existed in all times, among all peoples everywhere. With very sparse exceptions marriage has carried with it in varying degrees the concept that the status of a wife is subservient to that of her husband. It is true throughout most of the world today. In certain segments of Western civilization this has been modified. But it has never been abandoned nor rejected. It was not until this century that there was removed from the marriage ceremony of the Anglican Communion the vow of obedience to her husband taken by the wife. The present Queen of England and her sister were both married taking that vow despite its excision. I do not overlook the so-called emancipation of married women by recent repeal or modification of certain statutes but in the present context the use of that development beyond its limited scope can be misleading. For example, in this state when a married woman conveys her separate property her husband is required to join in the execution of the deed even though he has no interest whatsoever in the title. Other laws still discriminate against women, such as that of ineligibility for jury service without special registration.
"The law often trails social and economic changes. It is no longer tenable to characterize the female as the weaker sex. Women in this country inherit and own most of the property, they are the beneficiaries of more insurance, they receive better treatment throughout their lives and live several years longer than men on the average. Deaths among women from infectious and parasitic diseases are only two-thirds as frequent as among males, only two-thirds as frequent from diseases of the heart and circulatory system, the respiratory system, and only a little more than one-third from violent and accidental deaths. There are three times as many suicides among males, three times as many homicides, and more than twice the accidental deaths. *902 During the first year of life nearly 40 per cent more male children die. In numbers, there are more women than men. The evidence is clear that, in a material way at least, women are far more fortunate than men. They are born sounder and stronger, live healthier and longer lives, acquire and possess more of the world's goods and with considerably less effort than men.
"Paradoxically, no woman has excelled in any field in which man also participates. Women are not even the finest cooks nor the best tailors. Admitting the biological superiority of the female, her larger share of the wealth and the power that goes with it, and her capacity for emotional sympathy and empathy, it is nevertheless questionable whether her endowments qualify her to substitute her judgment for that of her husband in matters relating to his occupation.
* * * * * *
"Today, many married women work and contribute to the family income. In some instances they earn more than their husbands and sometimes they even support their husbands and children by their earnings. One would be blind to the world of things as they are did he not concede that the widespread change (at least in the United States) in the status of the wife from that of being solely occupied with housekeeping and the care of children to that of an active participant in many outside activities has had and is having a profound effect upon the traditional position of wives as enjoined by St. Paul.
"But giving full weight to all that and looking the present mores of society in this Republic in the eye, is the conduct of a wife who assumes (conceding the highest of motives) that she knows better than her husband what is best for him in the practice of his chosen profession, and who relentlessly pursues her objective to the point of destroying his career, justifiable or excusable? The precedents of two cases aid the answer. [Quoting at length from Kaadt v. Kaadt, 110 Or. 573, 223 P. 934 (Oregon 1924) and Williams v. Williams, 101 Minn. 400, 112 N.W. 528 (Minn. 1907). Also quoting from Holyoke v. Holyoke, 78 Me. 404, 6 A. 827, (Maine 1886).]
* * * * * *
"The plaintiff did not desert the defendant. Within two months after their separation he was dismissed from his employment as a direct result of her actions. It was necessary that he seek gainful occupation elsewhere to support himself and his dependents. He did so.
"The Japanese have a saying `A woman's tongue is only three inches long but it can kill a man six feet tall.' The late East Indian philosopher-poet, Rabindranath Tagore, in one short, pungent verse said more than volumes of learned lore:
"`Why did the lamp go out?
I shaded it with my cloak to save it from the wind, that is why the lamp went out.
"`Why did the flower fade?
I pressed it to my heart with anxious love, that is why the flower faded.
"`Why did the stream dry up?
I put a dam across it to have it for my use, that is why the stream dried up.
"`Why did the harp-string break?
I tried to force a note that was beyond its power, that is why the harp-string is broken.'
"The defendant wife has professed remorse. I believe that she truly loves the plaintiff and would forgive him her grievances. I would be happy if their marriage could be preserved, particularly for their children. But I cannot *903 minimize the effect upon him of her studied relentless campaign to remove him from the practice of his profession in an area and in an atmosphere which she deemed inimical to his interest. Her conduct undermined his physical and emotional well-being and caused his dismissal from the medical staff of the Foundation. The years of mistrust, misunderstanding, misconduct and separation destroyed not only his career but also his love. Her assumption of the role of his protector boomeranged. The lamp has gone out. The harp-string is broken."
Thus, it is apparent that the chancellor patiently considered the extensive testimony of numerous witnesses, listened at length to the husband's and wife's delineation of the tragic details of their marital history which began in 1942, sifted and sorted the many proffers of proofs, and in his discretion granted the husband a divorce. The record is more than ample to sustain the conclusion of the chancellor in granting the divorce and denying separate maintenance.[1]
This brings us to the questions regarding the adequacy or excessiveness of alimony and support money. The wife, having admitted that she set out on a course to have her husband discharged from his position at Silver Hills Foundation for which he was being paid the sum of $33,000 per year, is hardly in a position to now complain about the inadequacy of his present earnings of $12,000 per year. In fact, were it not for the wide latitude of the chancellor in these matters, we might be constrained to agree with the husband's cross assignment of error challenging the award of 78% of his income to the wife for alimony and support money for the children. However, irrespective of the causes of the disintegration of the family unit, the wife and children continue to live and must be supported. The chancellor was confronted with the usual money problem which exists when the family unit dissolves, that being: "Not enough money to go around." He wrestled with this problem and reached his decision. Even though he was on the brink of error, we cannot say as a matter of law that he abused his discretion. Those portions of the chancellor's decree touching upon support money, alimony, back mortgage payments, and school tuition, are affirmed.
We now consider the husband's cross assignments of error touching upon the chancellor's award of attorney's fees. The final decree required the husband to pay $3,000 to the wife's Florida counsel, and the aggregate sum of $3,998.14 (which includes expenditures for the taking of depositions and other costs) to Connecticut counsel. The overall financial circumstances of the husband reveal that payment of fees to the wife's attorneys, together with other sums previously paid by the husband, for all practical purposes, exhausted his financial resources. No challenge is made as to the reasonableness of the fee awarded to Florida counsel save as to the husband's ability to pay. This record reveals protracted litigation between the parties and capable services rendered by both Connecticut and Florida counsel to the wife. Adequate and competent proof was submitted to the chancellor upon which he acted in assessing the fees to be paid by the husband to the Florida counsel, and as to this award we affirm.
The attorney's fee awarded to Connecticut counsel poses a different problem. The sole proof adduced in the record sustaining the award of this fee is set out in the chancellor's final decree, viz.: "Messrs. Pullman, Cromley, Bradley & Reeves of Bridgeport, Connecticut, have submitted to the plaintiff a statement for professional services so rendered from December 16, 1959 to April 30, 1962, which together with necessary disbursements is in the total *904 amount of $3,998.14, such statement being defendant's evidentiary exhibit No. 9. This sum is a reasonable and proper charge to be paid by the plaintiff." An examination of the invoice to which the chancellor referred reveals that substantial charges were made for extensive services rendered by the Connecticut firm to the wife over a long period of time prior to the institution of the instant suit. Appellant in her brief states: "The total bill for services was $3,998.14, of which $1,203.48 is itemized to be directly attributable to the Florida divorce suit, $1,000.00 is itemized for services occurring from May 15, 1959 to October 30, 1959, which was considerably before the Florida divorce suit; the balance of $1,794.66, is itemized as having occurred from December 16, 1959, to after March 12, 1962, and included many direct references to the Florida divorce suit, but the amount of money is not so divided as to tell how much was charged before the institution of the Florida suit and how much after the institution of the Florida suit." Consequently, by appellant's own statement a large part of the fee so awarded was not connected with the instant suit, and from an examination of said invoice it affirmatively appears substantial charges have been included which pertain to litigation between the parties in the Connecticut courts prior to the institution of the instant action. Allowance of attorney's fees in divorce litigation is based solely upon statutory authority[2] without which the court would not have the power to assess attorney's fees.
The cited sections of the statutes plainly state "suit money". This phrase has been construed to be broad enough to include "attorney's fees" and it is now an accepted principle of law that the husband is liable for payment of the wife's attorney's fees when two factors exist: (1) necessities of the wife and (2) the husband's ability to supply such necessities.[3] The statutes set out as a predicate for award of suit money the institution and defense of a "suit", and we construe such terms as being applicable to a "suit" brought in this jurisdiction founded upon the provisions of Chapter 65, Florida Statutes, F.S.A. By like token, we conclude that such provision does not furnish authority for the granting of "suit money" or "attorney's fees" pertaining to causes of actions prosecuted in another jurisdiction or attorney's fees incurred by the wife long before the "suit" is brought in this jurisdiction.
The chancellor erred in awarding attorney's fees to Connecticut counsel for services rendered to the wife long prior to the institution of the instant action and not primarily a part of this proceeding. Furthermore, in the absence of stipulation of the parties, attorney's fees may only be awarded upon adducement of proper evidence to support the fee awarded. An invoice submitted by the attorneys rendering the service is not adequate proof to support any award of attorney's fees.[4]
The record being without proper proof it is impossible for this court to review the reasonableness of a fee to be awarded to the Connecticut counsel[5] and we, therefore, reverse that portion of the chancellor's decree awarding attorney's fees to the wife's Connecticut counsel with leave to the chancellor to receive proper proofs of the services rendered to the wife by Connecticut counsel in the instant action and to an allowance of attorney's fees based upon such proof.
Counsel for the appellant wife has petitioned this court for allowance of attorney's fees incurred in this appeal. As already *905 noted appellee's capital assets have been dissipated as a result of the prolonged litigation between the parties, and, in our opinion, the aggregate attorney's fees and court costs which the chancellor has directed him to pay constitute a sufficient burden in view of the circumstances of appellee. Since the wife was not successful in her appeal, we, therefore, conclude that additional attorney's fees should not be allowed.
Reversed in part and affirmed in part.
WIGGINTON, Acting C.J., concurs.
McLANE, Associate Judge, dissents in part.
McLANE, Associate Judge (dissenting in part).
The rationale of the majority opinion relating to the allowance of an attorney's fee is to prohibit the chancellor in a divorce proceeding, in the absence of stipulation of the parties, from allowing the fee unless expert testimony or proof has been introduced as to the value of the services. The chancellor should require proof as to the nature of the services rendered by the attorney so that he can intelligently fix the fee based upon his knowledge of the usual and reasonable fee charged for similar services. The chancellor having "lived with the case" from its inception and being familiar with the fees charged by the Bar where he presides should be in a position to fix a reasonable fee without expert testimony. Admittedly the opinion of the expert may be of assistance to the Court but mandatorily requiring it as a condition to the allowance of a fee can be time consuming, incur additional costs for expert fees, lengthen records, and unnecessarily impede prompt disposition of litigation. The holding of the majority may even prohibit the chancellor from allowing an attorney's fee on application for temporary relief in the absence of expert testimony as to the value of the services.
I therefore respectfully dissent from that portion of the opinion which without specifically so stating apparently requires the chancellor to receive expert testimony as a prerequisite to the allowance of an attorney's fee in a divorce proceeding.
NOTES
[1] The chancellor's entire memorandum opinion is published in 20 Fla. Supp. 70.
[2] Section 65.07 and 65.08, Florida Statutes, F.S.A.
[3] Helsel v. Helsel, 138 So.2d 99 (Fla.App. 3d, 1962); Floyd v. Floyd, 91 Fla. 910, 108 So. 896 (1926) and cases cited in these decisions.
[4] 10 Fla.Jur., Divorce, etc. § 140, p. 539.
[5] Hryckowian v. Hryckowian, 82 So.2d 879 (Fla. 1955).